# UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name* )
*and address)* )
) Case No. 19-sw-06090-NYW
)
Motorola Smartphone, IMEI NUMBER 352168105998362, )
and a black and orange Backpack, held in evidence and )
associated with Federal Bureau of Investigation case 266N- )
DN-3174668, currently stored in Federal Bureau of )
Investigation evidence and more fully described in )
Attachment A, attached hereto. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  **X**  evidence of a crime;

  **X**  contraband, fruits of crime, or other items illegally possessed;

  **X**  property designed for use, intended for use, or used in committing a crime;

  ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § __247__, and the application is based on these facts:

  **X**  Continued on the attached affidavit, which is incorporated by reference.

  ☐  Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ John W. Smith*
*Applicant's signature*

John W. Smith, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **02 Nov 2019**

*Judge's signature*
Nina Y. Wang
United States Magistrate Judge
*Printed name and title*

City and state: __Denver, CO__

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The property to be seized and searched is a Motorola Smartphone, IMEI NUMBER 352168105998362, (hereinafter and in Attachment B "the Device") and a black and orange backpack (hereinafter and in Attachment B "the Backpack"). The Device and the Backpack are currently being held in evidence at 111 South Tejon Street, Suite 600, Colorado Springs, CO 80903, under FBI case number 266N-DN-3174668.

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device and Backpack listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Section 247 **(hereinafter "Subject Offenses")**:

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **Subject Offenses**:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device or by other means for the purpose of committing violations of **Subject Offenses**.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **Subject Offenses** or that show who used, owned, possessed, or controlled the Device.

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device, or that aid in the identification of persons involved in violations of **Subject Offenses**.

7. Credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

8. Information about usernames or any online accounts or email addresses.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **Subject Offenses**.

10. Evidence of who used, owned, or controlled the Device to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

11. Evidence of software that may allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security

provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

12. Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence.

13. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

14. Evidence of how and when the Device were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user.

15. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device.

16. Passwords, encryption keys, and other access devices that may be necessary to access the Device.

17. Contextual information necessary to understand the evidence described in this attachment.

18. Weapons, to include, but not limited to, firearms and knives.

19. Explosive devices and materials, to include items that could be utilized to produce explosive devices.

20. Items that could be used to make/produce weapons.

21. White Supremacy paraphernalia, including but not limited to writings, clothing, books, flags, posters, and patches.

22. Masks or costumes designed to disguise a person's identity.

23. Gloves or other items that could obscure fingerprints.

24. Arsenic or any substance containing arsenic.

25. Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device onto the fingerprint sensor of any device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint.

DEFINITIONS:

26. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

# AFFIDAVIT

I, John W. Smith, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been since March 4, 2004. As part of my duties, I investigate criminal violations relating to terrorism, civil rights, and online threat communications. I have received training and instruction in the field of investigation of these criminal violations and have had the opportunity to participate in investigations relating to terrorism, civil rights, and online threat communications. As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. This affidavit is submitted in support of an application for a search warrant for a backpack and a Device, (more fully described in Attachment A), and the data located in the Device, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 247 (Damage To Religious Property; Obstruction Of Persons In The Free Exercise Of Religious Beliefs).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 247 are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE ITEMS TO BE EXAMINED

5. Several items are held in evidence at the Federal Bureau of Investigation (FBI) Colorado Springs, Colorado Resident Agency, which were discovered in the possession of Richard HOLZER and seized incident to his arrest on November 1, 2019. They are all being held in evidence under case number 266N-DN-3174668. The items include (1) Motorola Smartphone, IMEI NUMBER 352168105998362, hereinafter and in Attachments A and B the "Device," and (2) a black and orange backpack, hereinafter and in Attachments A and B the "Backpack."

6. Your Affiant believes there is probable cause to believe that the Device and the Backpack are or contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 247. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Device and the Backpack are currently in the lawful possession of the FBI. They came into the FBI's possession in the following way: The FBI performed a probable cause arrest of Richard HOLZER on November 1, 2019. The arrest occurred in Motel 6, Room #142, located at 4103 North Elizabeth Street, Pueblo, CO 81008. HOLZER brought the Device and the Backpack with him to the hotel room and they were seized incident to HOLZER's arrest.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

8. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

9. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They operate as GPS navigation devices and can store information about where they have been. They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

10. Information received from AT&T indicates Richard HOLZER's cell phone is a Motorola XT1921-2. Open source internet research on the features of this phone indicate it has a fingerprint recognition feature. I know in my training and experience that many cell phone users utilize the fingerprint recognition feature to unlock the device.

11. In addition, I know in my training and experience that many other mobile device manufactures have a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device. Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

12. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

13. Based on my knowledge, training, and experience, your Affiant knows that the Device(s) can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on the Device(s). This information can often be recovered with forensic tools.

14. Based on my knowledge, training, and experience, examining data stored on a digital storage device such as the Device(s) can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

15. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Wholly apart from user-generated files, digital devices like the Device(s) can contain electronic evidence of how it has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations. Users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    C. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

16. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

    A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment

of other devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain data that was sent or received and other records that indicate the nature of the offense.

G. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

17. *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each

individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

18. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

19. RICHARD HOLZER is a 27-year-old male living in Pueblo, Colorado. Facebook records show HOLZER to have used several Facebook accounts to promote white supremacy ideology and acts of violence, including racially-motivated acts of violence, in direct messages and group chats with other like-minded individuals. For example:

    - On September 3, 2019, HOLZER told another Facebook user, "I wish the Holocaust really did happen…they need to die."

    - On August 27, 2019, HOLZER told another Facebook user, "I hate them with a passion. I told this nasty Jew to fuck off or I'll kill him."

    - On July 17, 2019, HOLZER told another Facebook user, "I really, would like to go kill a bunch of Pedophiles and then die in a cop Shoot out."

    - On July 11, 2019, HOLZER sent the following Facebook message to another Facebook user, "getting ready to cap people." The message included three pictures. The first picture shows HOLZER in a kitchen dressed in clothing displaying white supremacy

symbols while aiming a long gun. The second picture shows HOLZER sitting with his back to a computer screen while holding a handgun in his right hand and a semiautomatic assault rifle in his left hand. The third picture shows HOLZER in what appears to be the same room as the prior picture holding a handgun in each hand, with the barrel of the handgun in his left hand touching his temple.

- On July 5, 2019, HOLZER told another Facebook user, "going to kill some spics…there's too many here (as expected) lol."

- On May 12, 2019, HOLZER sent a video to another Facebook user in which HOLZER says ". . . I'm just going to get dead by suicide by cop, so literally if I'm going to cause a shootout just die in it."

20. Temple Emanuel is a Synagogue serving a small congregation of Jewish families in Pueblo, Colorado. Its stated mission is to foster Jewish identity and ensure the survival of Judaism in a small community. Constructed in 1900, Temple Emanuel is the second-oldest synagogue in Colorado and is listed on the National Register of Historic Places.

21. On September 28, 2019, an FBI Online Covert Employee ("OCE") initiated contact with Richard HOLZER through one of his Facebook accounts. The OCE's Facebook account portrays her as a white female who is supportive of white supremacy ideology. She told HOLZER that Facebook suggested they be friends. HOLZER sent a picture of three buttons showing a swastika and two other symbols associated with white supremacy ideology. Shortly thereafter he sent pictures of himself wearing clothing with symbols and phrases associated with white supremacy. He stated that he lives in Colorado, used to be a member of the Ku Klux Klan (KKK), and is now a skinhead.

22. On September 28, 2019, Holzer asked the OCE to contact one of his other Facebook accounts, from which HOLZER sent another picture of himself with images related to white supremacy. HOLZER sent a video of himself showing him putting on a mask, grabbing a machete and saying, "May the gods be with me for what I must do." In reference to that video, HOLZER stated, "I went after another pedophile. It's something that I've actually enjoyed doing is killing them." HOLZER also sent two pictures of himself with firearms, as well as pictures of himself and other individuals he identified as skinheads who report to him. HOLZER also sent a video of himself showing him holding a knife saying, "fuck antifa." HOLZER later sent a video of himself urinating on the front door of what appears to be a Jewish center.

23. On September 29, 2019, HOLZER volunteered to the OCE that he previously paid a Mexican cook to "hex and poison a local Synagogue." HOLZER stated that the cook put arsenic in the water pipes of the Synagogue on October 31, 2018. HOLZER had previously recounted this incident to other individuals on Facebook. HOLZER explained that the man he paid was nicknamed "Mexican Hitler," and that he agreed to poison the synagogue "for cheap" because he and HOLZER both do not like Jews. HOLZER stated to the OCE that he had gotten backlash from the "white movement" because he hired a Mexican to do the job, but said "What do they expect? You guys really want the Jews gone then sometimes you gotta improvise." HOLZER stated that he paid the cook $70. The OCE then asked HOLZER to "let me know when you have an activist event coming up," and HOLZER responded with two videos that HOLZER appeared to have filmed previously showing Temple Emanuel in Pueblo, Colorado.

24. On October 3, 2019, HOLZER messaged the OCE, "I'm getting ready for RAHOWA," meaning a racial holy war. When the OCE asked Holzer to "message me after we can talk about RAHOWA,"

6

HOLZER responded by sending a voice recording in which he explained he was going to Temple Emanuel "to scope it out."

25. On October 4, 2019, HOLZER told the OCE he was going to "[c]heck out the synagogue and see if any ants come out of the HILL." HOLZER sent OCE a video showing Nazi propaganda, knives, and masks. Later that day, HOLZER sent a video to the OCE showing a woman outside of Temple Emanuel. In the video, HOLZER can be heard saying, "Oh shit. So this would mean the kikes are fucking going back into business here and uh we'll have to fucking figure out what they're going to do." HOLZER then told the OCE that on October 31 he would again poison the Synagogue, possibly with arsenic. He invited the OCE to join him, and the OCE told him that she and some of her friends may be able to be there. HOLZER also listed some of his associates who he said may also be involved.

26. On October 10, 2019, the OCE told HOLZER that she had friends who would be in the area of Colorado Springs, Colorado, the following week. HOLZER expressed interest in meeting them.

27. On October 12, 2019, the OCE and HOLZER discussed HOLZER meeting with the OCE's friends the following week. HOLZER stated that he might bring a friend of his. HOLZER also stated that everyone would need to wear masks "when we do the synagogue" to hide their identities. HOLZER also stated he intended to "[g]o out with a final act for the movement."

28. On October 12, 2019, an FBI undercover agent (UC-1) established contact with HOLZER, presenting himself as one of the friends the OCE mentioned to HOLZER. UC-1 told HOLZER that he and some friends planned to be in Colorado Springs, Colorado, the following week and they discussed meeting in person. HOLZER sent several pictures of himself with various images, paraphernalia, and clothing associated with white supremacy and Nazi ideology.

29. On October 13, 2019, HOLZER explained to UC-1 his plan to poison the Synagogue in Pueblo on October 31, 2019. HOLZER continued to send images related to white supremacy and Nazi ideology. On October 15 and 16, 2019, HOLZER confirmed with UC-1 that HOLZER and his friend "Skeeter" would be able to meet that Thursday (October 17). On October 16, 2019, HOLZER sent a video of himself to UC-1 explaining that on October 31 they would wear masks when they poisoned the Synagogue with arsenic.

30. On October 17, 2019, three FBI undercover agents (UCs) met with HOLZER and "Skeeter" at a restaurant in Colorado Springs, Colorado. HOLZER brought various white supremacy paraphernalia as gifts for the UCs, including a flag, several patches, a metal Thor's hammer, and a mask. Throughout the meeting HOLZER repeatedly expressed his hatred of Jewish people. HOLZER also stated that he believes in RAHOWA and explained RAHOWA is a Racial Holy War, based on the teachings of the church of the creator, founded by Matt Hale, who created that slogan to awaken white youth.

31. HOLZER recounted to the UCs that the year before, on October 31, a "witch doctor," whom HOLZER had paid $70, held a ritual in front of the synagogue in Pueblo and put arsenic in the water. HOLZER stated that the Synagogue was shut down for months after that and just recently reopened. HOLZER stated that people got sick from the arsenic and that he did not know if anyone died but he hoped so. HOLZER began talking about repeating the arsenic plan on October 31 of this year. He stated that his goal is to "make them know they're not wanted here." He stated that he wanted to shut the Synagogue down and condemn it. HOLZER then volunteered different ways to accomplish his goal, other than with arsenic. He mentioned welding the doors shut and said he would be willing to put together Molotov cocktails. HOLZER stated that he wanted to "vandalize the place beyond repair" and ideally force the city to tear down the building. HOLZER was the first person to mention the use of explosives during the meeting – he brought up Molotov cocktails

in response to one of the UCs asking an open-ended question about what other methods he was considering. Regarding the use of explosives, HOLZER told the UCs, "I'm as down as everybody else is . . . I want something that tells them they are not welcome in this town. Better get the fuck out, otherwise, people will die." HOLZER complained that when he visits the Synagogue, "I see these little kike kids and they have their little toys, they have their 'Jewla hoop' shaped like a star."

32. HOLZER, "Skeeter," and the UCs then drove to Pueblo, to visit Temple Emanuel. HOLZER observed that Molotov cocktails likely would not work because "simply busting out the windows is not gonna be enough." HOLZER and the UCs then discussed using pipe bombs. They discussed where they could place the pipe bombs, and HOLZER stated that he and "Skeeter" would go to the Synagogue when no one was there to try to determine where they could place explosives. The UCs offered to supply the pipe bombs, but cautioned that it would take some time because they would need to bring them in from out of state. HOLZER stated, "Let's get that place off the map." HOLZER also explained, "This is the big center here for them here in town. Thing is, why not hit the heart, right?" HOLZER said that he and "Skeeter" would come back when no one was around to further examine the building. HOLZER, "Skeeter," and the UCs then went to a nearby park and took a picture of themselves holding a white supremacy flag.

33. On October 19, 2019, HOLZER sent a video to UC-1 of HOLZER walking around the exterior of Temple Emanuel and commenting on various features of the building. Later that day, in a phone call, he told UC-1 that he wanted to put the Synagogue on the ground and demolish it. He also explained that the attack on the Synagogue would be "phase two" and that "phase three" would be outside of Pueblo and "bigger and better."

34. On October 19, 2019, in a group chat between HOLZER and the three UCs, one of the UCs (UC-2) said, "Let me know what you want the end result to look like and I'll get to work." On October 20, 2019, HOLZER responded with a picture of a church, half of which has crumbled to the ground, and stated, "Let's have it look something like that." HOLZER also sent a picture of an anti-Semitic caricature of a Jewish man.

35. On October 21, 2019, in the group chat, UC-2 stated that he was in the process of collecting supplies. HOLZER responded with a picture showing a Halloween mask and various white supremacy paraphernalia, including the book "Mein Kampf" and a flag or armband with a Nazi swastika. He wrote, "Everyone have a mask for "TRICK OR TREATING" followed by a skull and cross bones emoji, "If not, I got extras," and "Skeeter will need one and I'll hook him up."

36. On October 23, 2019, UC-2 sent two pictures to the group chat of what appear to be pipe bombs and the message "wanted to show you a little progress. Prepped several of these last night." HOLZER responded "Sieg Heil brothers." Later, HOLZER sent an audio file to the group chat relaying that he had talked to "Skeeter" and "he's absolutely elated about this, as am I. And I'm honored to be a part of history and, more importantly, the future of our folk. Heil."

37. On October 27, 2019, HOLZER sent an audio file to the group chat in which he stated "Hey guys, I'm in front of you know where. And the lights are on in the building and there's definitely movement in there. That means, like, literally they're definitely back in business. So it's a good thing we're going to do what we're going to do."

38. On October 31, 2019, HOLZER met again with UC-1. They discussed the plan to attack the Synagogue and agreed that HOLZER would meet with the UCs at a motel around 9pm on November 1 and examine the explosives before going to the Synagogue. At HOLZER's request, they went to a store to purchase gloves to use during the attack. HOLZER repeatedly affirmed that he was prepared to go through with the attack the following night. When UC-1 raised the possibility of someone being inside the Synagogue when they set off the explosives, HOLZER

stated that he did not think anyone would be there but that if they were, HOLZER would not care because they would be Jews.

39. The evening of November 1, 2019, UC-1 picked HOLZER up and drove him to the motel, where UC-2 and UC-3 were waiting. During the drive HOLZER was animated and displayed a Nazi armband. When they arrived at the motel, HOLZER addressed the UCs: "I wanted to thank each and every one of you for your time here tonight, I want to thank you for your utmost effort. Like, this is a move for our race. One of these days, we're probably gonna do something where one of us, couple of us even, probably won't come back." HOLZER removed several items from a backpack he was carrying ("the Backpack"), including a knife, a mask, and a copy of "Mein Kampf." UC-2 showed HOLZER two pipe bombs and two bundles each containing seven sticks of dynamite. HOLZER examined the explosives and declared, "this is absolutely gorgeous." HOLZER then explained that they should carry out the attack at 2:30 or 3:00 in the morning, to avoid the police.

40. Though the UCs told HOLZER that the pipe bombs and dynamite were functional and "high-grade explosives," they were all inert. The UCs also told HOLZER that UC-2 and UC-3 brought the pipe bombs and dynamite to Colorado from out of state. In fact, the dynamite and simulated black powder contained within the pipe bombs were shipped to Colorado from Quantico, Virginia, by the FBI in order to offer them to HOLZER.

41. HOLZER was arrested. The Device and the Backpack were seized incident to his arrest. Seizing agents conducted a cursory search of the Backpack to ensure it did not contain explosives or anything that could endanger law enforcement or the public. I understand that nothing was removed from the Backpack at that time and I am not aware of its contents. In order to preserve the ability to search the Device at a later time, I unlocked the screen of the Device, accessed the Device's settings, set the screen lock mode to "none," and put the Device in airplane mode. Based on my training and experience I know that if such steps are not taken immediately after seizing a smart phone, the smart phone may lock in such a way that it would be difficult or impossible to later search it. I did not view any content on the Device while taking these steps.

## **CONCLUSION**

42. Based on the investigation described above, probable cause exists to believe that inside the Device and the Backpack (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 247 (described on Attachment B).

43. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

        /s John W. Smith
John W. Smith, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this  2d  day of  November  2019

_[signature]_
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia Martinez, Assistant United States Attorney.